[No. 1633.]

## F. Schultz *v.* The State.

1. Lost Indictment — Substitution — Constitutional Law.— Quære, whether, in view of the prohibitions of the State and Federal Constitutions, a lost indictment for felony can, prior to plea by the defendant, be supplied by substitution other than a new presentment by the grand jury? Note the observations of Willson, Judge, on this subject, and the suggestion that a new presentment by the grand jury is the safer practice.

2. Same.—But, if the defendant has pleaded to the indictment before its loss or destruction, it may be supplied by substitution in the manner prescribed by Article 434 of the Code of Criminal Procedure, without infringement of any constitutional right or provision.

3. Same—Case Stated.—In a trial for felonious theft the indictment was read to the defendant, and he pleaded not guilty, but was convicted by the jury in a verdict written on the back of his appearance bond. The next day the prosecuting attorney suggested to the court that the original indictment was lost, and moved for leave to substitute it with a substantial copy certified by himself. Relevant to this motion affidavits were filed, showing that the original indictment was delivered to the foreman of the jury on its retirement to deliberate, but that it was not before the jury when they considered of and found their verdict of conviction. The trial court sustained the motion to substitute, and the defendant moved in arrest of judgment because he was not convicted "on indictment of a grand jury," in compliance with Article 1, section 10, of the Bill of Rights of this State, nor upon "due process of law," as required by the Fourteenth Amendment to the Constitution of the United States. *Held*, that the substitution of the indictment was properly allowed, and the motion in arrest of judgment correctly overruled.

4. PRACTICE—VERDICT.—The verdict must be in writing, but it is not imperative that it be written upon the indictment, nor that the jury shall have the indictment with them in their deliberations.

5. SUBSTITUTED INDICTMENT.—If, after plea to the original indictment, the indictment be lost, it may be substituted under direction of the trial court, independent of the provisions of Article 434, Code of Criminal Procedure.

6. THEFT—FACT CASE.—See evidence sufficient to sustain a conviction for cattle theft.

APPEAL from the District Court of Waller. Tried below before the Hon. W. H. Burkhart.

Appellant was tried for theft of a calf alleged to be the property of D. A. McAlpine and B. J. Stubbs. Being found guilty, his punishment was assessed at confinement in the penitentiary for the term of two years. He moved for a new trial, and also in arrest of judgment. Both motions were overruled, and he appealed.

D. A. McAlpine, for the State, testified that on July 14, 1883, he and B. J. Stubbs owned a brindle cow and her calf, running on the range in Waller county. Witness had never given permission to the defendant to take either the cow or the calf, or to appropriate the same. On the day named the witness found the cow about three-quarters of a mile from the defendant's house. She was lowing, and seemed to have lost her calf. To make her go to her calf the witness and his companions hallooed as if they were setting dogs on something. She went toward the defendant's house and lowed at his gate, and then went around the fence to a bunch of bushes, and there the witness and his companions found the head of a calf. By the flesh marks of the head the witness recognized it as the head of the calf of the cow already spoken of, belonging to witness and B. J. Stubbs. Witness then went to the justice of the peace and obtained a search warrant for the examination of the defendant's premises, and, with the warrant in the hands of E. Lacy, they returned to the defendant's, and there found on the fence the fresh clean hide of a calf. The hair on the hide was of the same color as the missing calf, and witness recognized the hide as that of the missing calf, which, like its mother, was of a brindle color. In the defendant's smoke house they found some nice fresh meat, which looked like the flesh of a calf.

On his cross-examination, the witness stated that the calf was ten or eleven months old when lost. Witness had not seen it

for three or four weeks prior to the discovery of its head and hide, and did not know whether or not it was branded. The right side of the hide was gone, and there was no brand on the portion found. Witness recognized the hide by the color, and the head by peculiarities in the forehead and horns. Witness refused to accept the defendant's offer to pay him fifteen dollars for the calf.

B. J. Stubbs, for the State, testified that he had not given his consent for the defendant to take the calf in question, which was the property of witness and D. A. McAlpine. The calf was branded with their brand on the right side, and was marked in both ears with their mark.

E. Lacy, for the State, testified to his accompanying D. A. McAlpine to the defendant's house, with the search warrant. Witness informed defendant that their business was to sea on his premises for stolen meat, and for the hide alleged to be that of the calf of McAlpine and Stubbs. Defendant replied that he did not know whether they would or not. Witness read the warrant to the defendant, and when he reached the part which placed the value of the calf at fifteen dollars the defendant stopped witness and told McAlpine that if he, McAlpine, claimed the calf, he, defendant, would pay him the fifteen dollars and say no more about it. The defense objected to this proof on the ground that it was in the nature of a confession made under arrest and uncautioned; but the court overruled the objection, and the defense reserved exceptions. McAlpine refused the fifteen dollars, and the search proceeded. Fresh beef was found in the defendant's smoke house, and the left half of the hide of a calf or yearling was found on his fence. The right side of the hide had been cut off, and there was no brand on the portion found. The hide was the same color as the missing calf. Witness knew the calf well, and had seen it the evening preceding the search, when it and its mother were along with the defendant's cattle, on the range about half a mile from defendant's house. The ears had been cut off of the calf's head which was found, but the head was exactly like that of the missing calf. The piece of hide found on the fence was fresh and clean, and did not appear to have been pulled about by hogs. Witness had not arrested the defendant when the latter offered to pay McAlpine fifteen dollars for the calf.

W. K. McAlpine, a witness for the State, testified to the same material facts stated by Lacy and D. A. McAlpine. He and

other witnesses were positive in their identification of the head and half hide as those of the missing calf.

The defense introduced and examined a daughter of the defendant. She testified that the defendant, on July 14, 1883, killed a little beef about a year old. Witness attended to the cattle and knew all about them; her father knew but little about them. She penned the cattle the evening previous to the day on which the defendant killed the little beef. It was along with the other cattle, and belonged to the defendant. Witness knew it well, and knew it was the defendant's property.

On cross-examination, the witness stated that she was milking in the cowpen when the little beef was killed. Her mother was getting breakfast, and came out for beef for breakfast. The calf was gentle, and after it was roped and tied to the fence her father knocked it in the head with an axe. The head was thrown over the fence, and the hide was left in the pen where the calf was killed. The hogs and dogs got hold of the hide and tore it, and about noon the defendant, after cutting off the part torn by the hogs and dogs, hung the remaining portion on the fence. The calf was in tolerable good order, and was marked and branded in the mark and brand of her father, the defendant.

In rebuttal, the State re-introduced D. A. McAlpine, who stated that he was well acquainted with the live stock of the defendant, and was not aware that the defendant owned any such an animal as that spoken of by the defendant's daughter. Witness had never seen one of that kind or description with defendant's brand on it. The piece of hide found on defendant's fence was fresh and clean, and bore no signs of having been pulled about in the dirt.

H. J. Shown, for the State, testified to the same effect.

The motion for new trial raised the question discussed in the opinion, and others not specially noticed.

*Harvey & Browne,* for the appellant: That an indictment can be substituted, is not denied; but it is contended that a copy made from the memory of the prosecuting officer, and established by no other evidence than his bare statement that it is a substituted copy of the original, is not a substitution by due process of law.

The power to present a substitute is co-equal with the power to present the original. The proper definition of the term *sub-*

*stitute*, is a second original to take the place of the first. A lost deed may be substituted by another deed from the same parties. This would never be called a copy. The evidence of the contents may be shown by a copy; this copy is never called a substitute; and it is in violation of the spirit of our Constitution to hold a a person to answer for a charge of felony on a copy of an indictment, though certified to be a true copy of an original. The defendant has the right of inspection of the first or subsequent originals.

To hold a person to answer the charge of felony on a copy of an indictment, made and certified to by the district or county attorney, in the manner provided in Article 434 of the Code of Criminal Procedure, would deprive the party of the right guaranteed by the State Constitution, to be held under an indictment of a grand jury; and the Fourteenth Amendment to the Constitution positively prohibits States from enforcing any law that abridges the right of a citizen, or from depriving any person of his liberty, without due process of law. It seems clear that this amendment to the United States Constitution is a limitation on the power of the State governments. That the statutes of a State violating any of the prohibitions of this amendment would be void, is equally clear.

The Constitution of our State is the law of the land, and guarantees that no person shall be held to answer a felony only on an indictment of a grand jury. The word indictment has a well known legal signification. (*Williams* v. *The State*. 12 Texas Ct. App., 398.) It is defined by statute to be "the written statement of the grand jury" (Code Crim. Proc., Art. 419), and by Bishop to be "a written accusation, on oath, by at least twelve of a grand jury, to be carried into court and there recorded." (Sec. 131). And it must show on its face that it had been found by competent authority, in accordance with the requirements of law. (Sec. 135). And such an indictment becomes one of the elements in the prosecution "in the due course of the law of the land." (*Hewitt* v. *The State*, 25 Texas, 728.)

After vigilant search, we fail to find any case where a prosecution for a felony under a substituted indictment made by the district or county attorney, under this statute, has been sustained. We find the case of *Elliott* v. *The State*, 14 Texas, and *Adams* v. *The State*, 17 Texas, both misdemeanors, it was said that an indictment could be substituted on proper evidence, but the same rule should not apply in felony cases, because an in-

dictment is not essential in the prosecution of a misdemeanor, while in a felony it is.

The record discloses that no indictment was before the jury when they arrived at their verdict, and none in existence at the time the verdict was received by the court. Nor can it be said that the verdict so received and recorded by the court was on an indictment. This court has refused in several instances to look to the merits of a case because no proper indictment or substitution was in the record, on constitutional grounds; and said that it was no part of defendant's duty to look after the indictment. (*Beardall* v. *The State*, 4 Texas Ct. App., 634; Webb's Crim. Law, sec. 20). ' What better right has the court *a quo* to take any steps whatever in a criminal trial in the absence of an indictment? It will be observed that the verdict was received on the sixteenth, and no attempt to substitute the loss was made until the eighteenth of October. We contend that it is the duty of the trial court to look to the records at every step in a criminal proceeding, and the court is chargeable with the custody or loss of the papers; and it is no part of defendant's duty to look after them. Wherever the power of substitution existed, it was in the power of the court to hold the jury until a proper substitution of the indictment was made. By such errors of the court the appellant was deprived of the right of a trial on an indictment, and in due process of the law of the land; and on this ground he is entitled to have this case reversed. It is as much the right of defendant to have the indictment accessible at the rendition of the verdict, as was his personal presence, which is held ground for reversal.

In *Cyrus* v. *Hicks*, 20 Texas, 483, a civil case where a judgment had been appealed from, and affirmed, and pending appeal the records of the District Court were destroyed, it was held in effect that an execution issued out of the District Court on said judgment prior to its being substituted was null. Why should not the same rule here apply ? The basis of the execution is a subsisting judgment; the basis of a verdict is a subsisting indictment.

The jury found defendant guilty as charged in the indictment. If there was no subsisting indictment, we can not determine of what he was found guilty. At the time the verdict was rendered, there was nothing in the records of the court that disclosed the nature of the offense. The minutes did show that the grand jury returned into court indictment seven hundred and

fifty-one, against F. Schultz, for theft; but the degree of theft was not given.

*J. H. Burts*, Assistant Attorney General, for the State: The indictment in this cause was not in reality substituted for the purpose of prosecution of the case in the court below, but for the purpose of a proper understanding of the case on appeal. The original indictment had served its purpose in the court below. Appellant had pleaded to it. The issues between the State and appellant arising on it, and appellant's plea of not guilty, had been submitted to the jury, who understood from it and the plea what the issue was. And after the trial the indictment was lost, and was only required for the hearing on the motion for a new trial, and to perfect the record for appeal. It was as much the interest of appellant as the State that the record should be perfected, which was done strictly in accordance with law. The indictment was lost. The district attorney suggested "the fact to the court," the same was "entered upon the minutes of the court," and another indictment was substituted upon the written statement of the district attorney that it was substantially the same as that which had been lost. And the district attorney and the court, following the suggestions of this court, vigilantly guarded every point, and had the record to "affirmatively verify it as a fact that the substitution was actually made," which is manifest from a solemn judgment of the court properly entered. This disposes of and settles the point attempted to be made on this mysterious disappearance of the indictment after the conclusion of the trial, and when the jury had retired to consider of their verdict. It would seem that to hold the substitution of the indictment in this case error, would open the door to fraud in all future criminal prosecutions. Under such a ruling the accused might in any case devise some scheme by which the indictment against him could be spirited away after the jury had retired. The precedent being uncalled for by the law upon the record in the case, should be avoided. (Code Crim. Proc., Art. 434; *Rogers* v. *The State*, 11 Texas Ct. App., 608.)

WILLSON, JUDGE. It appears from the record that the indictment was read to the jury on the trial, the defendant having entered a plea of not guilty thereto. When the jury returned their verdict into court the indictment was missing. It was

shown by the affidavits of the clerk of the court and of the prosecuting attorney that, when the jury retired to consider of their verdict, the indictment was handed by the clerk to the foreman of the jury. It was, on the other hand, shown by the affidavits of the foreman and two other members of the jury that the indictment was not before the jury when the case was being considered by them, nor when they made up their verdict. The verdict was written upon a bail bond, which was a paper in the cause.

When the loss of the indictment was ascertained, the district attorney suggested its loss to the court and moved to substitute it, which motion was granted, and the indictment was substituted. A motion in arrest of judgment was made by the defendant, and overruled by the court; which motion was based upon the ground that there was no indictment before the jury, or in court, at the time the verdict was made and returned into court. The court then proceeded to enter judgment upon the verdict, and after motion for new trial made and overruled, and after the court had pronounced the sentence upon the defendant, he appealed to this court.

It is argued by defendant's counsel that Article 434 of the Code of Criminal Procedure, providing for the substitution of an indictment, is violative of the Fourteenth Amendment to the Constitution of the United States, and also of Article 1, section 10, of our Bill of Rights. This Article of our Code was not contained in the original Code, but was engrafted thereupon by amendment, by act of February 15, 1858. Prior to the adoption of the original Code, we had a statute, however, which provided for the substitution of a lost indictment, though it was not so full and explicit in prescribing the manner and requisites of such substitution as is Article 434, before cited, and did not permit the substitution to be made except by the grand jury. (Hartley's Digest, Art. 464; *The State* v. *Elliott*, 14 Texas, 423.) But in *The State* v. *Adams*, 17 Texas, 232, it was held that an indictment might be substituted under the statute providing for the substitution of lost records in civil cases. (Pas. Dig., Arts. 4969, 4970.) That was a case where the indictment was for a misdemeanor, and no question was raised as to the constitutionality of the law with reference to indictments. In *The State* v. *Ivy*, 33 Texas, 646, which was also a prosecution for a misdemeanor, it was held that it was proper to substitute an indictment, and that the substitution need not be made by the grand

jury presenting another indictment, but might be made by the district attorney. There was no question raised in Ivy's case as to the constitutionality of the statute.

We have examined all the cases decided in our own State wherein the question of substitution or attempted substitution of the indictment has been before the court, and in none of them do we find the question of the constitutionality of this statute, in so far as it allows the substitution otherwise than by the act of the grand jury, presented or discussed. (*Turner* v. *The State*, 7 Texas Ct. App., 596; *Beardall* v. *The State*, 9 Texas Ct. App., 262; *Rogers* v. *The State*, 11 Texas Ct. App., 608.) It is therefore an open question in this State, and, in the opinion of the writer, is by no means free from difficulty.

By section 10 of our Bill of Rights, no person shall be held to answer for a criminal offense which is a felony, unless on indictment of a grand jury. Is a paper which has been substituted for the indictment by the act of the district or county attorney, in the manner provided by the statute, an *indictment of a grand jury?* If it is not, then is it within the power of the Legislature to provide that any person shall be held to answer for a felony upon it? But we are not called upon by the facts in this case to determine the question as to the constitutionality of the statute referred to, and we have adverted to it mainly for the purpose of calling the attention of prosecuting attorneys to the subject, and suggesting to them that it is much the safer and better practice, wherever it can be done, to substitute a lost indictment by having another one returned by the grand jury; which was the common law practice, and is the only mode of supplying a lost indictment in most of the States. (1 Bish. Crim. Proc., sec. 1400.)

In the case before us, the defendant was called upon to answer the original indictment, which was the act of the grand jury, and he pleaded to it as such, thereby admitting its genuineness. He was put upon his trial, therefore, "on indictment of a grand jury," in compliance with the requirement of our Bill of Rights, and upon "due process of law," as required by section 1 of the Fourteenth Amendment to the Constitution of the United States. It was not until after the defendant had pleaded to the indictment that it was lost and substituted. This being the case, the constitutional questions raised by defendant's counsel are not properly in the case. We find these questions ably discussed in two Alabama cases, where the difference between the

substitution of a lost indictment before trial, and its substitution after plea to the merits, is clearly pointed out.

In the first case, *Ganaway* v. *The State,* 22 Alabama, 772, an indictment was substituted before trial. by a proved copy thereof. The court said: "The question here is, can an indictment be substituted before trial. * * * * The power of substitution is claimed as a power inherent in every court to supply such papers, or parts of the record, as may have been lost by accident or destroyed, which constitute a necessary part of the proceedings. * * * But this power does not embrace an indictment. The court has no power to make an indictment, or to direct one to be made. That power resides exclusively with the grand jury. * * * In the matter of preferring an indictment the grand jury are the sole judges, under their oath, of the propriety of their own action. * * * The right is conceded to the prisoner to be arraigned on the indictment found by the grand jury; to have an inspection of that identical paper, in order to make his objections to its form or substance, if any exist. The rule is one which tends to make solicitors careful in drawing indictments, with reference to the question we are discussing, and clerks extremely careful of their safe custody. We doubt whether, on the whole. any good would be accomplished by overthrowing a rule which is productive of these consequences. When an indictment is lost or destroyed, it can generally be supplied by having a new one found by the grand jury." Accordingly. the court in that case held that the indictment could not be substituted.

In *Bradford* v. *The State,* 54 Alabama, 230, the indictment was lost after the trial had commenced, and after the defendant's plea of not guilty thereto had been entered, and upon discovering the loss of the indictment it was substituted. pending the trial of the case. Bradford's case being a parallel case to the one before us, with reference to the question we are discussing, we shall extract from the able opinion of Chief Justice Brickell at length. The opinion says: "Courts of record, independent of express legislation, have power to substitute any of the files or records which may be lost or destroyed. The power is matter of necessity, whether the loss occurs while the cause is *in fieri*, before it has progressed to final judgment, or after such judgment has been rendered, and whether the loss is of the whole record, or of papers which, when it is finally made up, will constitute a part of it. In reference to civil cases, the

statute now provides, 'if an original pleading be lost, or with-held by any person, the court may order a copy to be filed in place of the original.'

"In *Ganaway* v. *The State*, 22 Alabama, 772, the majority of the court, recognizing this power of the court in civil cases, denied the power to substitute an indictment before arraignment and trial. Since the statutes provide that if an indictment is lost, mislaid or destroyed, the court may, on satisfactory proof there-of, order another indictment to be preferred. And further pro-vides the time elapsing between the finding of the first and the subsequent indictment shall not be computed as part of the time limiting the prosecution of the offense. Neither the decision in Ganaway's case nor the statute meets the question now pre-sented—the loss of an indictment, the verity of which was in-disputable. The opportunity of inspecting it had been afforded, and, availing himself of the opportunity, he tested by demurrer its sufficiency. The demurrer being overruled, the plea of not guilty—he declining to plead—was entered for him before the loss of the indictment. There can be no apprehension that an indictment against him had not been preferred by the grand jury, or that he was put on his trial to answer the genuine find-ing of the grand jury. The indictment having been lost after plea, after the jury had been impaneled and the evidence closed, the result is, the prisoner was entitled to his discharge, if the continuous existence and presence in court of the indictment was essential, and the court could not by substitution supply its loss.    *    *    *    *    *    *    *    *    *

"Without infringing on the decision in Ganaway's case, or invoking the aid of the statute, as matter of legal principle, jealous of the safety of the accused, and preservation of all the rights guaranteed to him, we cannot apprehend there is any real difficulty in affirming the power of the court to permit, or indeed to compel, the substitution of the indictment, under the facts found in the record, with or without the consent of the accused. The indictment, under our laws, is an indispensable constituent of the record. To answer it the defendant is ar-raigned, and to it his plea is the answer, whether he voluntarily interposes it, or the court, when he stands mute, intervenes for him. Before he can be arraigned and put on his trial the record must disclose an indictment, that it is the finding of a grand jury, organized in the mode prescribed by law, and by them re-turned into and accepted by the court.    *    *    *    When

pleaded to, either by the plea of *not guilty*, or by general demurrer because of its insufficiency in law, its genuineness as a record stands admitted. Neither plea would be proper, or authorize the rendition of judgment, unless interposed to a genuine indictment.        *        *        *        *        *        *        *

" Of the existence of the original indictment, and of its verity, there could be and was no controversy. The substitution was the introduction into the record of matter previously recognized by the court, and admitted by the defendant, of matter, the verity of which had previously passed beyond controversy. It was the duty of the court to make the record speak the truth; to conform it to the facts as they existed when the defendant was arraigned, pleaded, and was put on his trial; thereby no right of the accused was imperiled; he is not subjected to any other jeopardy than that in which he was placed when put on his trial. That the grand jury had made a presentation against him; that it was returned into court; that he had admitted its verity, was already judicially ascertained, and was apparent of record. His clear, constitutional right was to a verdict from the jury impaneled and sworn, which he had accepted as his triers. The loss or destruction of the indictment could not take away this right. The State had a corresponding right that the trial should progress, and a judgment of conviction or acquittal be rendered, finally determining the prosecution. Such rights cannot be impaired or destroyed by the accidental loss or the wilful abstraction or destruction of papers pending the trial. The substitution of such papers on satisfactory proof, by the court, is the only mode of supplying the loss, and lies within the inherent power of the court. Otherwise the progress of a cause could be arrested; the escape of the criminal could be secured by the felonious abstraction, or the accidental loss of the indictment. In Ganaway's case, and in the case provided for by the statute, the loss may be supplied by preferring a new indictment, and that, when it can be pursued, is the more conservative practice, if the statute had not directed it. But when, pending the trial, the indictment is lost or destroyed, the defendant being in jeopardy, the result is his discharge, or it must rest in the power of the court to supply the loss by substitution. Rights, neither of the State nor of individuals, are lost by the loss of records or the constituents of a record in the custody of courts or public officers. We are of opinion the court had power, without the consent of the accused, or of his counsel, to order the substitution."

If the opinion from which we have so largely copied announces the correct practice, it is as applicable here as in Alabama; and, when applied to the case in hand, is authority in point for sustaining the action of the court in substituting the indictment. We think the reasoning of Chief Justice Brickell in Bradford's case is sound and unanswerable, and, in so far as that case holds that the indictment may be substituted after the defendant has pleaded to it, we fully indorse it. We hold, therefore, in the case before us, that the court did not err in permitting the lost indictment to be substituted.

There is no requirement of our law that the jury *must* have the indictment with them when they are considering their verdict. It is provided that "the jury *may* take with them, on retiring to consider of their verdict, all the original papers in the cause, and any papers used as evidence." (Code Crim. Proc., Art. 693.) This is permissive only, and not mandatory. Nor is there any requirement that the verdict of the jury shall be written upon the indictment, but only that it shall be in writing and signed by the foreman. (Code Crim. Proc., Arts. 705, 706.)

But it is further contended by the defendant's counsel that in this case the indictment was not substituted in the manner required by the statute, and by the decisions of this court. We find in the record a written suggestion of the loss of the indictment, setting out the facts, and asking the court for leave to substitute, accompanying the same with a paper which is certified by the district attorney to be a substantial copy of the lost indictment; and following this motion and proposed substitute indictment is an order of the court granting the district attorney leave to substitute, and showing affirmatively that the substitution was made. We are of the opinion that the record shows a substantial and sufficient compliance with the statute, and with the decisions of this court. (*Clampitt* v. *The State*, 3 Texas Ct. App., 638; *Turner* v. *The State*, 7 Texas Ct. App., 596; *Beardall* v. *The State*, 9 Texas Ct. App., 262; *Rogers* v. *The State*, 11 Texas Ct. App., 608.) But even if the substitution had not been made in compliance with the statute, but was made under the direction and in a manner satisfactory to the court, we are of the opinion that in a case like this, where the substitution is after plea to the indictment, it would be held sufficient, independent of the statute.

There are several other assignments of error, some of which

we find are not supported by the record, and those that are supported by the record are not, in our opinion, tenable.

We find no error in the record, and the judgment is affirmed.

*Affirmed.*